436 So.2d 1022 (1983)
FLORIDA MEDICAL CENTER, INC., d/b/a Florida Medical Center and Florida Patient's Compensation Fund, Appellants,
v.
Susan Ann VON STETINA, by and through Her Parents, Legal Guardians and Next Friends, Mary VON STETINA and Leo Von Stetina, Appellee.
Nos. 82-1332, 82-1341, 82-1597, 82-1686, 82-1992, 82-1993, 82-2070 and 82-2078.
District Court of Appeal of Florida, Fourth District.
August 10, 1983.
Motions to Stay Mandate Granted August 24, 1983.
Rehearing Denied August 30, 1983.
*1023 David M. Orshefsky, G. Michael Keenan and William H. Lefkowitz of Ruden, Barnett, McClosky, Schuster & Russell, P.A., Bernard & O'Brien, Fort Lauderdale, and Steven R. Berger of Steven R. Berger, P.A., Miami, for appellant Florida Medical Center.
Talbot D'Alemberte and Jeffrey B. Crockett of Steel Hector & Davis; Samuel J. Dubbin, Miami, Charles W. Ehrhardt, Richard B. Collins of Perkins & Collins, Tallahassee, for appellant Florida Patient's Compensation Fund.
Sheldon J. Schlesinger of Sheldon J. Schlesinger, P.A., Fort Lauderdale, and Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, for appellee.
Bruce Culpepper of Culpepper, Beatty & Turner, P.A., Tallahassee, and Richard A. Sherman of Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane, Miami, amicus curiae, for Florida Medical Malpractice Joint Underwriting Ass'n.
John D. Buchanan, Jr., of Henry, Buchanan, Mick & English, P.A., Tallahassee, amicus curiae, for Florida Hosp. Ass'n.
James E. Tribble and Diane H. Tutt of Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, amicus curiae, for Florida Defense Lawyers Ass'n.
LETTS, Judge.
Before us is the consolidation of eight appeals, all emanating from a 12.47 million dollar compensatory damage award in a medical malpractice case. That sum is appealed as reversibly excessive, as is the trial *1024 judge's ruling that Section 768.54(3)(e)(3) of the Florida statute limiting the payout of the award is unconstitutional. Further, Section 768.54(2)(b) limiting the liability of the health care provider to $100,000 per claim was likewise found to be unconstitutional. In addition the trial court found Section 768.51 of the Florida statutes to be inapplicable, or in the alternative, unconstitutional. We affirm all of the above.
Also appealed is the upholding of the section in the medical malpractice statute awarding attorney's fees to the prevailing party. Section 768.56. We likewise affirm this ruling. However, we reverse the award of 4.4 million dollars found to be "reasonable attorney's fees" under that same section of the statute.
The only other issue addressed, is the ruling permitting into evidence an account, written in the first person, purporting to describe the turmoil of emotions which a helpless patient must endure when a respirator malfunctions. We affirm.

FACTS
It is hard to imagine a more tragic scenario. A young, attractive woman, hospitalized after an auto accident, required treatment in the intensive care unit after surgery and was placed on a respirator which malfunctioned. As a consequence, the air supply was interrupted and irreversible brain damage ensued, condemning the plaintiff to a forty year life expectancy as a pathetic, half-blind, hopelessly bedridden, painracked incompetent who nevertheless can recognize people and respond to sounds, love, and touch. In the poetic words of her counsel, "she is a prisoner in her own helpless body and must experience the ultimate nightmare every waking moment of the remainder of her tragically destroyed life."

REASONABLENESS OF VERDICT
We begin with a discussion on whether the jury award is reversibly excessive and we cannot find it so.
It is large, even enormous, yet, it is not without basis. With testimony projecting a life expectancy of 40 years and evidence that the present day annual cost of ideal care for this patient is $188,400, simple arithmetic multiplies to over 7.5 million dollars. To that we must add past medical and nursing care, past and future loss of earnings, and last but by no means least, pain and suffering. The Patient's Compensation Fund and the Hospital argue under Loftin v. Wilson, 67 So.2d 185, 190 (Fla. 1953), that the over 4 million dollars in future pain and suffering will mean nothing to her because she "is barely sentient." However, this plaintiff, unfortunately for her perhaps, possesses all the senses in varying degree, is no longer on a respirator, has some understanding, and must endure incessant pain and suffering. As we said in City of Tamarac v. Garchar, 398 So.2d 889, 896 (Fla. 4th DCA 1981),
Much has been written regarding the review of verdict amounts but few definitive rules have been enunciated by the courts. See Bould v. Touchette, 349 So.2d 1181 (Fla. 1977) and School Board of Palm Beach County, Inc. v. Taylor, 365 So.2d 1044 (Fla. 4th DCA 1978).
One rule is definitive, however, and that is "a party who assails the amount of a verdict as excessive has the burden of showing it is unsupported by the evidence or that the jury was influenced by passion or prejudice." See Talcott v. Holl, 224 So.2d 420 (Fla. 3d DCA 1969). Nevertheless the over 4 million dollar portion of this verdict for 12.47 million dollars that was allocated to future pain and suffering does give cause for concern and we must ask: Is it within the "reasonable range" prescribed in the Bould v. Touchette decision, supra? It is admittedly at the maximum of any reasonable range but we decline to override the jury and label it unreasonable. Forty years imprisonment within a helpless body racked with pain and requiring nearly $200,000 worth of medical care each year can hardly be equalled by all the tortures of the damned.

PAYOUT AND LIMITATION OF LIABILITY
Passing next to the question of whether the trial court erred in declaring Sections *1025 768.54(2)(b) and 768.54(3)(e)(3), Florida Statutes (1981) unconstitutional when applied to the facts of this case, we conclude that it did not.
First of all, we are of the opinion that it is the 1981 version of Section 768.54(3)(e)(3) which governs. The tragedy occurred in December of 1980 and the new statute was not effective until July of 1982. Statutes must not be given retroactive application unless an intent to do so is clearly expressed, Dade County v. Ferro, 384 So.2d 1283 (Fla. 1980) or unless the statute is merely procedural, remedial or affects the measure of damages. Heilmann v. State, 310 So.2d 376 (Fla. 2d DCA 1975). In the case at bar, we are firmly of the opinion that this statute affects a substantive matter (indeed the Fund, on p. 15 of its initial brief, agrees) and that no change in the measure of damages is involved here, only the method of payout. We also reject the Fund's argument that retroactive application is not required because the plaintiff's rights do not vest until this decision is published.
The content of the trial judge's order which we deem pertinent reads as follows:
Section 768.54 provides generally that all privately owned hospitals must join the "Florida Patient's Compensation Fund", and that if they comply with the statute they "shall not be liable for an amount in excess of $100,000.00 per claim". The statute shifts the obligation to pay any judgment in excess of this amount to the fund, but limits the fund's obligation to pay the judgment (after a lump-sum payment has been made for attorney's fees and costs) to "not more than $100,000.00 per person per year until the claim has been paid in full". To the extent that the statute creates a trust fund in the nature of liability insurance for the hospital, the Court does not find it constitutionally offensive. To the extent that the statute restricts the plaintiff's right to recover her judgment from the hospital and that fund, however, it violates several fundamental provisions of both the Florida and United States Constitutions when applied to the facts in this case.
After a careful study of the statute, the Court has concluded that it does not contemplate the entry of judgments against the hospital and fund limited to the amounts set forth in the statute; instead, it clearly contemplates that judgments for the full amount of the jury's verdict be entered against the hospital and the fund, and then merely controls the manner in which those judgments are to be paid. That conclusion is compelled by the following portions of the statute: subsection (2)(b); subsection (3)(a); subsection (3)(e). Once it is recognized that the statute imposes no substantive limitation upon the plaintiff's right to judgments in the full amount of her damages, and that the statute merely prevents collection of the judgments except on the terms prescribed by the statute, it is clear that the statute does nothing more than direct this Court how to enforce collection of the judgments. This type of legislative direction is unconstitutional, however, because it impermissibly encroaches upon powers granted exclusively to the judicial branch of our government. It is settled that a trial court with constitutional jurisdiction to render a final judgment has "the inherent power ... to enforce collection of its judgments". STATE ROAD DEPARTMENT v. BANKERS LIFE & CASUALTY CO., 166 So.2d 234, 235 (Fla. 3rd DCA 1964). It is also settled that "[t]he legislature has no power to prescribe rules regulating the conduct of the Court's business or other matters within the inherent power of the Court to regulate". SYDNEY v. AUBURNDALE CONSTRUCTION CORP., 96 Fla. 688, 119 So. 128, 129 (1928). Since both of these propositions are settled, it is clear that § 768.54[1] is unconstitutional  because it attempts to *1026 limit this Court's inherent power to enforce the judgments entered in this case.
The statute also violates both the equal protection and due process clauses of the Florida and United States Constitutions. The "tests" to be applied to the statute in measuring its constitutionality against both of these clauses are essentially the same:
The test to be used in determining whether an act is violative of the due process clause is whether the statute bears a reasonable relation to a permissible legislative objective and is not discriminatory, arbitrary or oppressive.
... .
In order to comply with the requirements of the equal protection clause, statutory classifications must be reasonable and non-arbitrary, and all persons in the same class must be treated alike. [Citation omitted]. When the difference between those included in a class and those excluded from it bears a substantial relationship to the legislative purpose, the classification does not deny equal protection. [Citation omitted].

LASKY v. STATE FARM INSURANCE CO., 296 So.2d 9, 15, 18 (Fla. 1974). The statute arguably satisfies one minor aspect of these tests: it "bears a reasonable relation to a permissible legislative objective". See CARTER v. SPARKMAN, 335 So.2d 802 (Fla. 1976); PINILLOS v. CEDARS OF LEBANON HOSPITAL CORP., 403 So.2d 365 (Fla. 1981). The statute does not satisfy the remaining criteria of the tests, however.
The plaintiff's judgments render the defendants liable to her in the amount of $12,473,250.00. Included within that amount is a sum of $7,536,000.00 for necessary future medical expenses (reduced to present money value). The jury also found that the plaintiff's life expectancy is 40 years. In other words, the jury has determined that the plaintiff will require a sum of approximately $188,400.00 per year (in present money value) to meet her necessary future medical expenses. The statute, of course, prohibits the plaintiff from recovering her judgments now. Notwithstanding its apparent intent, however, the statute also prohibits the plaintiff from ever recovering her judgment. After deduction of the plaintiff's attorneys' fees (which, assuming a reasonable contingent fee of 40%, will be approximately $4,900,000.00), the principal balance of the judgments remaining will be approximately $7,500,000.00. That $7,500,000.00 will earn interest at the statutory rate of 12%, or approximately $900,000.00 per year. Since the statute limits the defendants' liability on the judgments to $100,000.00 per year, it is clear on the facts in this case that the plaintiff will not even recover enough to defray 85% of the annual interest accruing on the principal balance of the judgments, much less recover any portion of the principal. Simply put, the plaintiff can never recover her judgments under the terms of the statute, notwithstanding that subsection (3)(e)(3) provides that the plaintiff is to be paid "until the claim has been in full". In short, the statute  as applied to the facts in this case  is arbitrary, oppressive, intrinsically unfair, and internally contradictory (since it contemplates the ultimate satisfaction of a judgment which is made impossible by the terms of the statute itself). The statute is therefore irrational in the extreme, when applied to the facts in this case.
In addition, notwithstanding that the jury has determined that the plaintiff will require approximately $188,400.00 per year (in present money value) over her 40-year life expectancy simply to meet her necessary expenses for medical care, the statute arbitrarily limits her recovery to $100,000.00 per year  a sum which is slightly over one-half of the sum necessary to keep her alive presently, and which will diminish to considerably less than half that amount as the years pass and the value of the dollar decreases. A statute which contemplates that the plaintiff be paid in full, and which then caps her annual recovery at an amount which is insufficient to keep her alive is *1027 irrational in the extreme, and it violates the plaintiff's fundamental right to life on the facts in this case.
Further, the statute actually subverts its own announced purpose of alleviating the "medical malpractice insurance crisis", because it prevents good faith settlements and requires all medical malpractice actions in which a claim greater than $100,000.00 is made to be tried to judgment. That conclusion is compelled because, although subsection (3)(e)(1) "authorize[s the fund] to negotiate with any claimants having a judgment exceeding $100,000.00 cost to the fund to reach an agreement as to the manner in which that portion of the judgment exceeding that $100,000.00 cost is to be paid", the statute does not authorize the fund to settle claims before judgment on any terms other than those set forth in the statute. Depriving the defendants of any ability to compromise good faith claims, and requiring them instead to litigate all serious claims to judgment, clearly increases the cost of defending the medical malpractice actions which are filed against participants in the fund every year  which is not a reasonable solution to the high cost of defending medical malpractice actions which the statute is supposed to provide.
... And the statute creates two classifications of medical malpractice tort victims  those with insignificant injuries who are compensated in full, and those with substantial and life-threatening injuries, such as the plaintiff, who are not even provided a sufficient amount of money to pay the interest accruing on the amounts owing them, much less an amount of money to pay their necessary medical expenses. It is the latter classification which is particularly offensive to the equal protection clauses of the two constitutions, since it is impossible that singling out the most seriously injured medical malpractice victims (rather than imposing the same burden equally upon all medical malpractice victims) bears any reasonable relationship to the announced purpose of alleviating the "medical malpractice insurance crisis".
We adopt in both result and principle all of the above and additionally would point out that the award, less attorney's fees, would, under the statute, take over one hundred years to pay out even if the statutory interest never accrued.
We would not be particularly concerned about our conclusion, so certain are we of it, were it not for a late development from our Supreme Court. A recent decision from the First District found another portion of this medical malpractice statute unconstitutional. See Southeast Volusia Hospital District v. State, Department of Insurance, 432 So.2d 592 (Fla. 1st DCA, 1983). It is true that the section examined by the First District [Section 768.54(3)(c)] is not applicable here, but the Supreme Court, on expedited appeal and recognizing a great public importance, stated in a preliminary order that the "statute is constitutional on its face." See Department of Insurance, State of Florida v. Southeast Volusia Hospital District, 438 So.2d 815 (Fla. 1983). We do not really believe the court intended this blanket order to cover all of the sections of the medical malpractice statute, but its action, scheduled to be followed by a full opinion, taken in pari materia with some of the language in the Pinillos decision, supra, does raise the definite possibility that the court might disagree with us in the near future. This is the paramount reason we hasten to publish this opinion.
Section 768.54(2)(b) provides that: "A health care provider shall not be liable for an amount in excess of $100,000 per claim... ." The Hospital argues that the reasons advanced by the trial court as the basis for the entry of a judgment in the full amount of the verdict is tantamount to glossing over the express language of the statute, thus directly conflicting with Mercy Hospital, Inc. v. Menendez, 371 So.2d 1077 (Fla. 3d DCA 1979), cert. denied, 383 So.2d 1198 (Fla. 1980), wherein the court stated:

*1028 The provision in the statute [768.54(2)(b)] is one of limitation of judgment upon the performance of conditions specified.
Id. at 371 So.2d 1079. The Hospital also contends that the trial court erred when it concluded that this section of the statute is unconstitutional because it constitutes an infringement upon the inherent authority of the court to enforce its judgment.
In Mercy Hospital, Inc., supra, the principal question before the Third District Court was whether a defendant health care provider is required to plead the Medical Malpractice Reform Act in order to receive the benefits of the limitation or whether it is sufficient to show compliance with the statute in limitation of judgment after the entry of a jury verdict. The court held that the plaintiffs had the burden of making the Fund a party to the suit where recovery is sought in excess of $100,000, and that upon the plaintiff's failure to make the Fund a party, the trial court may within the time allowed, upon proper motion pursuant to Florida Rule of Civil Procedure 1.530, enter an order for the limitation of the judgment in accordance with Section 768.54(2)(b), Florida Statutes (1977). We must respectfully disagree with our sister court. We believe the trial court, in the case now before us, properly decided that, "The statute imposes no substantive limitation upon plaintiff's right to judgment in the full amount of her damages," and that the statute merely prevents collection of the judgments except on the terms prescribed therein.
While both our sister court and the Hospital conclude that the intent of the statute is to limit judgments, such a conclusion is not supported by the statute. Section 768.54(3)(e)(3) provides:
A person who has recovered a final judgment ... against a health care provider who is covered by the Fund may file a claim with the Fund to recover that portion of such judgment ... which is in excess of $100,000. ... (emphasis added).
It is clear from this section of the statute that the legislature did contemplate judgments in excess of $100,000 against health care providers and that the trial judge was eminently correct when he determined that the purpose of the statute was not to limit the amount of the judgment against the health care provider, but rather to prescribe the manner of collection of the judgment. We also agree with the trial court's additional conclusion that the statute is unconstitutional "because it impermissibly encroaches upon the powers granted exclusively to the judicial branch of our government."
In a related point, both the Fund and the Hospital seek the benefit of another section of the Florida Statutes in the event we chose to declare the two sections already discussed unconstitutional which indeed we have. This other section referred to is Section 768.51, Florida Statutes (1981) which states in part:
(1) In any action by a patient against a health care provider, as defined in s. 768.50(2)(b), in a tort or contract claim for malpractice in which the trier of fact determines that the amount necessary to compensate the claimant for future losses exceeds $200,000, payment of amounts intended to compensate the claimant for losses to be incurred in the future shall be made by one of the following means:
... .
(b) The court may, at the request of either party, enter a judgment ordering the damages for future losses to be paid in whole or in part by periodic payments rather than by a lump-sum payment.
The trial court refused to apply this section finding it inapplicable because the Fund is not a "health care provider," and in any event the future components of damage were not computed before reduction to present value in this case making the statute impossible to apply.
Subsection (1) begins, "In any action by a patient against a health care provider, as defined in Section 768.50(2)(b), in a tort or contract claim for malpractice... ." In turn, Section 768.50(2) provides:
(b) "Health care provider" means hospitals licensed under chapter 395; physicians *1029 licensed under chapter 458; osteopaths licensed under chapter 459; podiatrists licensed under chapter 461; dentists licensed under chapter 466; chiropractors licensed under chapter 460; naturopaths licensed under chapter 462; nurses licensed under chapter 464; clinical laboratories registered under chapter 483; physicians' assistants certified under chapter 458; physical therapists and physical therapist assistants licensed under chapter 486; health maintenance organizations certificated under part II of chapter 641; ambulatory surgical centers as defined in paragraph (c); blood banks, plasma centers, industrial clinics, and renal dialysis facilities; or professional associations, partnerships, corporations, joint ventures, or other associations for professional activity by health care providers.
This rather clearly eliminates the Fund from the benefit of the statute. The Fund's argument on this point is not convincing, especially when one refers to the nine words of subsection (b) quoted above and now repeated: "The court may, at the request of either party... ." The only two parties referred to before this sentence is the defendant health care provider and the "claimant." Further, the use of the word "may" renders it discretionary.[2]
This section goes on to require future periodic payments to be structured upon future damages computed "before any reduction to present value." Section 768.51(1)(b)(1). The Hospital and the Fund agreed to a verdict form which required the jury to reduce all future economic losses to present money value and it eliminated any finding for future damages not so reduced. Thus the trial court had no numbers corresponding to such unreduced future damages upon which to structure such a judgment. The Fund asserts that they are unnecessary and that the trial court could use the procedure specified in the new version of the payout limitation section and order payment of future special damages as they are incurred, or, that the final award could be invested and the proceeds given to the plaintiff as provided in the statute, thus offsetting the present value reduction. However, this would involve a rewriting of the statute and there is simply no authority for either of these two "solutions."
While it is true there is no need to pass on the constitutionality of this latter section if we find, as we have done, that it is inapplicable, it does appear we should do so in the event that the Supreme Court disagrees with the foregoing. This will enable the Court to rule at its earliest opportunity, it having declared the entire medical malpractice act a matter of great public importance requiring immediate resolution.
We, therefore, find Section 768.51(1)(b) unconstitutional when applied to the facts of this case and in so doing once again adopt the language of the trial judge. Our use of his language on these constitutional findings should not be interpreted to suppose that we embrace each and every word thereof. However, time appears to be of the essence and to craft our own versions of the unconstitutionality would incur considerable delay. The trial judge's order in part states as follows:
In addition, although the statute [768.51] does not suffer all of the deficiencies inherent in § 768.54 (since it at least gives this Court some discretion to ensure that the plaintiff will recover sufficient sums to pay her future medical expenses and ultimately recover her judgment during her life expectancy), the statute nevertheless contains a number of the same deficiencies which render § 768.54 unconstitutional. Like § 768.54, the statute impermissibly encroaches upon the inherent power of this Court to enter and enforce its own judgments. In addition, the statute arbitrarily and invidiously discriminates against medical malpractice victims who have suffered damages in excess of $200,000.00 by placing all of the *1030 burden for alleviating the perceived "medical malpractice insurance crisis" upon them, and no burden whatsoever upon any medical malpractice victim who suffers damages in an amount less than $200,000.00.

ATTORNEY'S FEES
Turning our attention next to the fourth constitutional question presented, we now examine Section 768.56, Florida Statutes (1981) which provides for the prevailing party to be awarded attorney's fees in medical malpractice actions. We find nothing unconstitutional in this section.
We had assumed the answer to this particular question would easily boil down to whether we should employ a rational basis test or a strict scrutiny test. We have no trouble opting for the former and indeed our Supreme Court has already decided it applies in malpractice cases. See Pinillos v. Cedars of Lebanon Hospital, supra. However, to our chagrin, we have discovered that while the strict scrutiny test, which we reject, stands largely unsullied, the rational basis counterpart has been divided, by judicial fiat, into sub-tests and standards such as "minimum scrutiny," "minimum standard of review," "some reasonable basis," "without any rational basis," "means scrutiny," "means oriented scrutiny," "substantial relationship," "just and reasonable relationship" and "no legitimate state purpose." To be sure, some of these have legitimate distinctions: several refer to equal protection, others to due process and still others to both. See Sasso v. Ram Property Management, 431 So.2d 204 (Fla. 1st DCA 1983). Had we the time, we would attempt to resolve and catalogue these fine distinctions, apparently sometimes erroneously used interchangeably on anything but a rational basis by the courts. Instead, we harken back to the good old days when constitutional law was, like everything else, relatively straight-forward and seize upon the case of Hunter v. Flowers, 43 So.2d 435, 436 (Fla. 1949) wherein the court said:
The validity of statutes awarding attorneys' fees to successful litigants has been upheld in various types of cases in recent years. The rule gleaned from the decided cases seems to be that, so long as the classification is based upon some difference bearing a reasonable and just relation to the act in respect to which the classification is attempted, there is no violation of the "due process" and "equal protection" clauses of the Fourteenth Amendment of the Constitution of the United States.
So far as we can determine, this Flowers holding is still valid and taken together with Pinillos, supra, is controlling.
To be sure, the section before us singles out medical malpractice plaintiffs and defendants for special treatment not afforded all tort victims and tort feasors, but that in and of itself is not fatal. See Lasky v. State Farm Insurance Co., 296 So.2d 9 (Fla. 1974) and Chapman v. Dillon, 415 So.2d 12 (Fla. 1982). As we see it, the only question before this court is whether Section 768.56 creates a reasonable classification which bears a reasonable relationship to a permissible legislative objective. All of the sections so far construed by the courts have the same preamble and it is unquestioned that all of them were enacted for precisely the same reasons as the sections already upheld in Pinnillos v. Cedars of Lebanon Hospital, supra; Woods v. Holy Cross Hospital, 591 F.2d 1164 (5th Cir.1979) and Carter v. Sparkman, 335 So.2d 802 (Fla. 1976). We acknowledge that the section applicable to the final case cited in the preceding sentence was struck down in Aldana v. Holub, 381 So.2d 231 (Fla. 1980) but not for reasons germane to the issue before us now. There are over seventy Florida Statutes awarding attorney's fees upon the outcome of litigation, see Volume 4 Florida Statutes p. 402 (1981), and while two, or for that matter seventy, wrongs do not make a right, we perceive no such wrong in the section now before us.
Having determined that the statute, directing the award of a "reasonable" attorney's fee to a prevailing party, is constitutional, we now address the question of whether the trial judge erred in granting a *1031 fee of 4.4 million dollars on a verdict of 12.47 million dollars. We believe he did and we reverse.
Let us preface this holding by dispelling all doubt as to trial counsel's entitlement to a 40% contingent fee from his client under the terms of his fee contract. Contingent fee contracts invariably result in proportionately large fees unless the result is adverse. However, the lawyer's share can never be large unless the normally delighted client's portion is even larger.[3] Contingent fee contracts have recently been specifically blessed by our Supreme Court, In the Matter of the Florida Bar, 349 So.2d 630 (Fla. 1977). Moreover, they constitute one of the reasons why the courts are truly open to all of us. In many countries, such as England, where such fee arrangements are champertous,[4] the ability of the poor man or woman to take his or her just cause to court is restricted because they have to pay their lawyers win or lose. Indeed, our Supreme Court has remarked that the contingent fee is the poor person's key to the courthouse as proved to be the case for the plaintiff before us now. Nonetheless, there remains the question of whether this plaintiff, having had that contractual key unlock the door to one of the largest verdicts ever recorded in Florida for compensatory damages, can now transfer her contract obligation to others by reason of an enacted statute contemplating "reasonable" attorney's fees. We think not.
In a well reasoned order, the trial judge reviewed the criteria for fees set forth in Canon 2 of the Code of Professional Responsibility, specifically Rule 2-106 promulgated thereunder. Those criteria are as follows:
(1) The time and labor required; the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.
We agree with much of what the trial judge said. The plaintiff's attorney is one of the outstanding practitioners in this field. He spent "the better part of an entire year on this cause." The questions involved were novel and difficult and the result and amount obtained were spectacular, in no small measure due to counsel's experience in the field.
The trial judge's order stressed that the award was arrived at reasonably rather than by reference to a contingent fee. Yet on five occasions he also alluded to contingent fees in a manner which leaves us in no doubt that such weighed heavily on his mind. For example, he stated that the use of the contingency method is how the fee is customarily arrived at in the area of medical malpractice. Moreover, he announced that "the court has therefore relied heavily upon the expert testimony ... particularly upon the testimony of the preeminent and highly respected experts in this field who testified on behalf of the plaintiff." Their testimony as to a reasonable fee in this case, bore an exact parallel to the 40% contingency called for in the contract. Thus, one expert said 5 million dollars was reasonable and the other chose the identical sum. Needless to say, 40% of 12.47 million dollars is 4.988 million dollars. Finally, the *1032 judge noted that contingent fees in such cases ran anywhere from 33 1/3% to 50% of the award whereupon, having so stated, he awarded a sum within that range. All in all, we are convinced the contingent fee factor was uppermost in the judge's mind and was of paramount importance in arriving at the sum awarded. In this he was in error.
A "reasonable" fee, whether under a statute or otherwise, has seldom been likened to a contingent one. In truth, the reverse has been the norm. See Ronlee, Inc. v. P.M. Walker Co., 129 So.2d 175 (Fla. 3d DCA 1961); Kaufman and Broad Home Systems, Inc. v. Sebring Airport Authority, 366 So.2d 1230 (Fla. 2d DCA 1979); United States Steel Corp. v. Green, 353 So.2d 86 (Fla. 1977); Insurance Company of North America v. Welch, 266 So.2d 164 (Fla. 4th DCA 1972); and Baker v. Varela, 416 So.2d 1190 (Fla. 1st DCA 1982).
Most of the cases cited in the previous paragraph at least mention time and effort expended. Yet in the case now before us, trial counsel kept no time sheets and the judge below conceded that he only considered time expended as "a minor factor." We disagree, and while we refuse to place any dollar per hour figure on the services of trial counsel in a case such as this, we deem it an abuse of discretion, under the facts, to award a so-called "reasonable" statutory fee of 4.4 million dollars. Our refusal to be governed solely by an hourly rate deserves explanation. Extremely competent counsel, within the area of his or her particular expertise, may find the right answer to a specific problem in a matter of minutes, or indeed already know it. By contrast inexperienced counsel may be required to search for that same answer for hours at a time, even assuming he or she finally arrives at it correctly. As we see it, it would be unfair to permit the pupil to out-bill the master simply because, in his or her ignorance, the former puts in longer hours.
We have perused this record in agonizing detail, reviewed the transcript and admired the astute trial tactics of counsel. We have also considered the brilliant result, the time that must have been expended, each of the criteria prescribed by the canons of ethics and the transcript of the hearing on attorney's fees. From all of this, we conclude a reasonable fee to be 1.5 million dollars and we so hold.
We are not impressed by plaintiff's argument that we are in effect taking approximately 3 million dollars away from his client when we reduce the fee from 4.4 to 1.5 million dollars. She agreed contractually to pay him 40% of the recovery, yet others, who must now pay this legal piper by reason of state statute, were not privy to that contract and could never have been reasonably expected to pay such a vast sum. Under the legislative intent, as reported by the state senate staff analysis, a reasonable fee was specifically noted as intending no impact on contingent fee arrangements. We would keep it thus.

EVIDENTIARY MATTER
Turning at last to the question of admission into evidence of an imaginary account written in the first person about a helpless patient's state of mind when a respirator malfunctions, we find it was error to admit it, but not reversible error.
Apparently this emotional account[5] had been a standard handout to all ICU nurse-trainees at this hospital for several years. None will question that its laudable purpose was to help to indelibly impress upon the students the appalling effect of a respirator malfunction so that maximum vigilance over helpless patients would never be relaxed for so much as an instant. While both sides mount various well-worn arguments as to the hearsay rule and its exceptions, it was almost conceded at oral argument that this account is not really hearsay at all and but a work of fiction. The plaintiff's counsel insists it is relevant *1033 because it depicts a supposed level of demanded nursing care which all nurses are made aware of as standard procedure. This argument might have merit except that this particular work of fiction was not presented by its author and there was no predicate whatever that the plaintiff, or any other patient for that matter, had actually endured such thoughts and emotions under this or similar circumstances. Courts are supposed to deal in facts not fiction and we, therefore, believe error occurred.
We have deliberated long and hard on whether this error was reversible. The record redounds with other heartrending evidence of what this plaintiff has suffered and will suffer. Plenty of other evidence was given about the horror of respirator malfunction, certainly enough to make the nerve ends tingle. The plaintiff was brought to the courtroom obviously so that the jurors could see her pitiful condition. A video tape of the ghastly happenings every time she has to undergo physical therapy was played both to the jury and to this court. Moreover, all reasonable persons live in great trepidation and awareness of asphyxiation whether it be by drowning or whatever.
All in all, while we find the fictional account most moving, we also believe it was cumulative. There was so much other deeply moving evidence that we believe the account's admission was harmless error because we conclude that it did not materially affect the outcome. Accordingly, we will not disturb it.
We either find no merit in, or see no necessity to address, any remaining points on appeal.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR ENTRY OF AN ATTORNEY'S FEE JUDGMENT IN THE SUM OF 1.5 MILLION DOLLARS.
DOWNEY and DELL, JJ., concur.
NOTES
[1] This statement is too broad. We approve of this holding only as it pertains to Sections 768.54(2)(b) and 768.54(3)(e)(3).
[2] The Fund cites cases urging "may" to be construed as mandatory  this is done only where a statute says a thing "may be done by a public official which is for the public benefit." Perry v. City of Fort Lauderdale, 352 So.2d 1194 (Fla. 4th DCA 1977).
[3] This presumes that the contingent fee contract calls for forty percent as it did in this instance.
[4] 32 Henry VIII; Glegg v. Bromley [1912] 3 KB 474; Winfield, The History of Maintenance & Champerty, 35 LQR 50; and 4 B1 Comm. 135, 136.
[5] Exhibit 24 is an article entitled "Just Breathing" by Carol B. Allen, RN, which appeared in the November, 1974 issue of Nursing magazine.